AUSA: Jun Xiang

| UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK | 23 MAG 7692 |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DANIEL SCOTT,<br><br>Defendant. | **SEALED COMPLAINT**<br><br>Violations of 21 U.S.C. § 846, and 18 U.S.C. § 924(c)<br><br>COUNTY OF OFFENSE: BRONX |

SOUTHERN DISTRICT OF NEW YORK, ss.:

DANIEL CALLINAN, being duly sworn, deposes and says that he is a Detective with the New York City Police Department ("NYPD"), and charges as follows:

## COUNT ONE
### (Conspiracy to Distribute Narcotics)

1. From at least in or about November 2023 up to and including at least in or about December 2023, in the Southern District of New York and elsewhere, DANIEL SCOTT, the defendant, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

2. It was a part and an object of the conspiracy that DANIEL SCOTT, the defendant, and others known and unknown, would and did distribute and possess with the intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

3. The controlled substances involved in the offense were: (i) mixtures and substances containing a detectable amount of heroin, (ii) mixtures and substances containing a detectable amount of fentanyl, and (iii) mixtures and substances containing a detectable amount of cocaine base, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Section 846.)

## COUNT TWO
### (Firearms Use, Carrying, and Possession)

4. From at least in or about November 2023 up to and including at least in or about December 2023, in the Southern District of New York and elsewhere, DANIEL SCOTT, the defendant, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, namely, the drug trafficking crime charged in Count One of this

Complaint, knowingly used and carried a firearm, and in furtherance of such crime, possessed a firearm, which was brandished and discharged.

(Title 18, United States Code, Section 924(c)(1)(A)(i), (ii), and (iii).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5.  I am a Detective with the New York City Police Department and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation, and my conversations with law enforcement officers, law enforcement employees, and witnesses, as well as my review of documents. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

6.  Below is a Google Map showing the intersection of Brook Avenue and East 137 Street in the Bronx, New York, and the surrounding neighborhood. Locations referenced in this Complaint are marked with black letters. The block that is south of East 137 Street and Brook Avenue, which contains green spaces, is the location of the Millbrook Houses, which includes 520 East 137 Street (which is marked as location "C").



7.  Based on my participation in this investigation, my review of documents, law enforcement records, and other evidence, including surveillance video recordings, and my

2

conversations with other law enforcement officers, I have learned, in substance and in part, the following:

a. On or about November 16, 2023, at approximately 4:30 p.m.,[1] an individual wearing a green T-shirt, a green cap, and a black vest ("Dealer-1") and other men congregated at the corner of Brook Avenue and East 137 Street in the Bronx, which is marked location "A" in the map above. As Dealer-1 stood at the corner, an elderly woman ("Customer-1") approached and appeared to ask Dealer-1 a question, prompting Dealer-1 to shake his head. Customer-1 then began crossing East 137 Street.

b. As Customer-1 was crossing the street, two individuals known to me ("CC 1" and "CC-2") arrived on the corner and greeted Dealer-1.[2]

c. Customer-1, who was now in the middle of the street, accepted something from another man and returned to Dealer-1 with a wad of cash. Dealer-1 and Customer-1 met by a mailbox and—as CC-1 and CC-2 observed—Customer-1 appeared to give Dealer-1 money before walking away. Dealer-1 then remained at the mailbox, looking at his hands in a way consistent with counting money. Customer-1 returned to the mailbox, where Dealer-1 appeared to hand her a small object.

d. Dealer-1 then walked over to where CC-1 and CC-2 were standing and, in the course of speaking with them, handed CC-1 a small item. After about a minute, CC-2 gave something in return to Dealer-1. Throughout this interaction, CC-1, CC-2, and Dealer-1 repeatedly surveyed their surroundings, and they exchanged the items very quickly. Based on my review of the video surveillance summarized above, I believe that Dealer-1 sold drugs to Customer-1, and that Dealer-1 gave the proceeds of the sale to CC-1 and CC-2, who then supplied Dealer-1 with more drugs to sell.

e. During the time that CC-1, CC-2, and Dealer-1 were engaged in these apparent drug transactions, an individual known to me ("Rival-1")[3] was standing across the street, on East 137 Street, between Brook Avenue and St. Ann's Avenue, which is marked as "B" on the map above. As CC-1, CC-2, and Dealer-1 were engaged in the interactions described above,

---

[1] The time stamps across different cameras were not synchronized, so the same events may have different time stamps across different vantage points. Accordingly, the times in this Complaint are approximate. I have confirmed the overall sequence of events by reviewing the same events across cameras.

[2] I recognize CC-1 and CC-2 because, in the course of performing my duties, including physical surveillance: (a) I have seen CC-1 in person approximately two dozen times since in or about 2017; (b) I have seen CC-2 in person approximately a half-dozen times since in or about early 2023. In addition, I have reviewed law enforcement records containing photographs of both CC-1 and CC-2.

[3] I recognize Rival-1 because, among other things, I interviewed Rival-1 in person on or about November 30, 2023.

3

Rival-1 appeared to take a phone call and looked repeatedly in their direction. Other men in Rival-1's group also began looking in CC-1 and CC-2's direction.

    f.  After the call ended, Rival-1 conferred with other men in his group and then began walking toward CC-1 and CC-2, meeting them at the corner marked as location "A" on the map. Rival-1 then commenced a heated argument with CC-1, during which they pointed and gestured around them.

    g.  At the conclusion of this apparent argument, at approximately 4:38 p.m., Rival-1 crossed back to the other side of Brook Avenue to rejoin the group of men he had been standing with at the location marked as "B." As Rival-1 walked, he appeared to make a phone call. At approximately the same time, another person ("Rival-2"), who was standing at the front entrance of 520 East 137 Street (the "Building")—which is part of the Millbrook Houses and marked as location "C" on the map above—accepted a phone call.

    h.  After standing with his group for a few more minutes at location "B," Rival-1 looked at his phone and met with Rival-2 at the entrance of the Millbrook Houses—near the location marked as "D" on the map—across the street from where Rival-1 had originally been standing.

    i.  Following his meeting with Rival-2, Rival-1 returned to rejoin the group of men standing at location "B." Rival-1, as well as other members of this group, continued to stare in the direction of CC-1 and CC-2, who continued standing at location "A." CC-1 and CC-2 stared back and, at times, CC-1 gesticulated in the direction of Rival-1's group. CC-1 repeatedly used his cellphone and appeared to take a phone call.

    j.  At approximately 4:46 p.m., CC-1 and CC-2 were joined at the corner of East 137 Street and Brook Avenue by an individual known to me ("CC-3").[4] After CC-3 arrived, CC-1 spoke excitedly to CC-3, while pointing in the direction of Rival-1 and the Rival-1's group.

    k.  Approximately one minute after the arrival of CC-3, Rival-2, now riding a blue scooter, approached CC-1, CC-2, and CC-3. Rival-2 appeared to exchange words with them. CC-1, CC-2, and CC-3 then walked away, northbound up Brook Avenue.

    l.  Following his discussion with CC-1, CC-2 and CC-3, Rival-2 took another phone call. Rival-1 and Rival-2 then met up and spoke briefly on Brook Avenue, before traveling southbound together, with others from Rival-1's group, toward the Millbrook Houses. They returned to the front entrance of the Building shortly after 4:50 p.m.

    m.  A few minutes later, DANIEL SCOTT, the defendant,[5] CC-1, CC-2, CC-3, and other individuals (the "SCOTT Group") followed Rival-1's group from Brook Avenue back

---

[4] I recognize CC-3 because, in the course of performing my duties, including physical surveillance, I have seen CC-3 in person approximately twenty times since in or about 2020.

[5] I recognize SCOTT because, in the course of performing my duties, including physical surveillance, I have seen SCOTT in person approximately forty times since in or about 2020, and

to the Millbrook Houses. CC-1, CC-2, and CC-3 were wearing the same clothing they were seen wearing at earlier points in the videos, although CC-2 now wore a full-face black ski mask. SCOTT and CC-1 walked ahead of the others in the group. SCOTT—whose face and clothing are more clearly visible from other camera angles discussed later in this Complaint—was wearing a gray zip-up sweatshirt with decorative black trim, a shiny black puffy jacket, and a gray knitted cap. In the still images below, SCOTT is circled in green and CC-1 is circled in red.



---

I have participated in an interview of SCOTT. In addition, I have reviewed law enforcement records containing photographs of SCOTT.



n.    SCOTT and CC-1 walked up toward the front entrance of the Building, where they were met by a group that included Rival-1, Rival-2, and other individuals (the "Rival Group"). CC-2, CC-3, and others from the SCOTT Group soon joined. SCOTT greeted Rival-1 and others in the Rival Group. Rival-1 appeared to address SCOTT, after which CC-1 appeared to address Rival-1, at times gesticulating forcefully. Rival-2 appeared also to address SCOTT. In the still images below, SCOTT is circled in green, CC-1 is circled in red, Rival-1 is circled in orange, and Rival-2 is circled in white. SCOTT can be seen wearing distinctive black and white sneakers, which based on my experience and review of publicly available materials, appear to be Nike Air Force One Jordan 4s.



o.  As the group conversation continued, CC-1 suddenly punched Rival-1 in the head. In response, Rival-1 pulled out a gun and fired several shots in the direction of the SCOTT Group. The members of SCOTT Group—including SCOTT, CC-1, CC-2, and CC-3—fled northbound, toward Brook Avenue.

p.  As SCOTT was initially backing away, he reached inside of his jacket with his right arm, as shown below. SCOTT stumbled to the ground and, as a result, lagged somewhat behind the rest of the fleeing SCOTT Group. Accordingly, SCOTT can be identified on video surveillance even from angles in which he is far away. Like others in the SCOTT Group, SCOTT ran northbound toward East 137 Street.



q.  SCOTT reached East 137 Street and turned left, running westbound, toward the intersection with Brook Avenue. As he rounded the corner, at the location marked "D" on the map, SCOTT fired multiple gunshots in the direction of the entrance of the Building, into which

7

the Rival Group had fled. The stills below are from a video recording that shows approximately three muzzle flashes from the firing of a firearm at around location "D."





   r. Video surveillance tracks SCOTT running westbound up East 137 Street, crossing Brook Avenue and Brown Place. SCOTT ran up the entry stairs to an apartment located on East 137 Street (the "Hideout Location") and went inside at approximately 4:57 p.m. The video surveillance is the clearest of SCOTT's face and clothing, as shown below.

8



        s.      Several minutes later, other individuals from the SCOTT Group—including CC-1, CC-2, and CC-3—also entered the Hideout Location. Based on my discussion with a property manager, I have learned that CC-3 is the tenant of record for the Hideout Location.

        t.      Approximately thirty minutes after the shooting, Rival-2 started looking intently at the ground outside of the front entrance of the Building, at location "C," where Rival-1 had fired the gunshots at the SCOTT Group. Multiple times, Rival-2 bent over to pick something up off the ground. Before he bent over, Rival-2 looked around to see whether anyone was observing him. Rival-2 immediately put what he had just picked up inside his pocket. Based on my training and experience, I know that when a pistol fires a round of ammunition, it ejects the shell casing onto the ground, near where the gun was fired. Based on the video surveillance described above, I believe Rival-2 looked for, found, and successfully retrieved the shell casings ejected from Rival-1's gun. Based on my review of law enforcement records, I know that police officers did not recover any shell casings near the front entrance of the Building.

        u.      Police officers recovered three .380 caliber shell casings on the sidewalk of East 137 Street, near the location marked as "D" on the map, where SCOTT fired gunshots in the direction of the Rival Group. In addition, a bullet struck the exterior of Max Health Pharmacy, a business located on the north side of East 137 Street, near location "B" on the map. That bullet partially shattered the pharmacy's window. Another bullet struck a parked vehicle on East 137 Street.

        v.      On or about November 30, 2023, Rival-1 was arrested and, at the time of arrest, Rival-1 possessed on his person a baggie of apparent crack cocaine, among other items. In post-arrest statements made after his waiver of <u>Miranda</u> rights, Rival-1 denied that he was a drug dealer and asserted, in substance and in part, that he was involved in a confrontation but did not see who shot at him.

    w. On or about December 6, 2023, Rival-2 was arrested and, at the time of arrest, Rival-2 possessed, on his person and on his scooter, approximately ten glassines of apparent crack cocaine, approximately 40 pills, and a round of ammunition, among other items.

    x. On or about December 18, 2023, law enforcement officers executed a judicially authorized search warrant at the Hideout Location. SCOTT, CC-1, CC-2, and CC-3 were not present at the time of the search, although other individuals were. Inside a closet, police officers recovered a loaded firearm.

  8. On or about December 26, 2023, I participated in the arrest of DANIEL SCOTT, the defendant, on state charges and I observed that, at the time of arrest, SCOTT was wearing a shiny black puffy jacket, shown below, which appears to be the jacket that SCOTT wore during the November 16, 2023 shooting.



  9. On or about December 26, 2023, I participated in the execution of a judicially authorized search warrant at an apartment located on East 140 Street, Bronx, New York. Prior to the execution of the search, DANIEL SCOTT, the defendant, stated, in substance and in part, that the apartment was his residence and that he was the sole occupant. During the search, law enforcement recovered, among other items, the following:

    a. A gray zip-up sweatshirt with black trim, which appears to be the sweatshirt that SCOTT wore during the November 16, 2023 shooting;

    b. A pair of Nike Air Force One Jordan 4 sneakers, which appear to be the sneakers that SCOTT wore during the November 16, 2023 shooting;

c. A gray knitted cap, which appears to be the cap that SCOTT wore during the November 16, 2023 shooting;

d. A black .380 caliber Taurus TCP pistol (the "Firearm"), shown below, containing approximately six rounds of .380 caliber ammunition, which is the same caliber as the shell casings found near location "D," where SCOTT fired shots toward the Rival Group during the November 16, 2023 shooting;



e. A separate, high-capacity magazine, shown below;



f. A black bag containing approximately 22 additional rounds of .380 caliber ammunition;

g. Approximately 42 glassine envelopes of a substance that later tested positive, in a laboratory, for fentanyl and heroin;

11

    h. Approximately two twist bags of a substance that later tested positive, in a laboratory, for crack cocaine;

    i. Glassine envelopes, plastic bags, a scale, a razor blade, and other drug paraphernalia, some of which appeared to bear drug residue, shown below; and



    j. Over $900 in United States currency.

  WHEREFORE, I respectfully request that a warrant be issued for the arrest of DANIEL SCOTT, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

_____
DANIEL CALLINAN
Detective
New York City Police Department

Sworn to before me this 28th day of December, 2023

_____
THE HONORABLE BARBARA MOSES
United States Magistrate Judge
Southern District of New York